UNITED STATES of America

v.

Mohammad S. MOHAMMAD.

Nos. 95 C 7426 (92 CR 438–1).

United States District Court,
N.D. Illinois,
Eastern Division.

April 7, 1998.

Brian Patrick Netols, United States Attorney's Office, Chicago, IL, for U.S.

Mohammad Saleh Mohammed, Duluth, MN, pro se.

## MEMORANDUM OPINION AND ORDER

GETTLEMAN, District Judge.

On January 13, 1993, a grand jury returned a superseding indictment charging defendant Mohammad S. Mohammad ("Mohammad") and others with conspiracy and multiple counts of bankruptcy fraud, mail fraud, wire fraud, and structuring cash transactions to avoid IRS reporting requirements. After a jury trial, Mohammad was convicted on all counts in which he was named. On October 25, 1993, the district court sentenced him to 92 months in prison, fined him $9,600, and ordered $3.2 million in restitution. The Court of Appeals affirmed Mohammad's conviction and sentence. *See United States v. Mohammad,* 53 F.3d 1426 (7th Cir.1995). Mohammad now challenges his conviction and sentence pursuant to 28 U.S.C. § 2255.

### BACKGROUND

The charges against Mohammad arose out of a "bust-out" scheme executed by Mohammad and his co-defendant (collectively "defendants"). Defendants started by creating Discount Merchandise, Inc. ("Discount") as an operating business. They then ordered goods on behalf of Discount, sold the goods at prevailing wholesale market prices, and paid the suppliers. In this way, defendants established credit references for Discount. Over time, defendants began ordering larger and larger quantities of goods on credit. Eventually, defendants fraudulently obtained over $3.2 million in goods on credit. Most of these goods were stored in a warehouse. They then "busted-out" by selling the goods (often at prices below cost), not paying the suppliers, and diverting the proceeds, totaling over $1.7 million, to their personal bank accounts. Eventually, defendants declared Discount insolvent. Defendants concealed the diversion of the fraudulently obtained proceeds by: (1) structuring bank deposits in an attempt to avoid the reporting requirements of the Currency Transaction Reporting Act; (2) smuggling approximately $1.2 million in proceeds out of the country; and (3) destroying business records.

### DISCUSSION

"Habeas corpus relief under 28 U.S.C. § 2255 is limited to an error of law that is jurisdictional, constitutional, or constitutes a fundamental defect which inherently results in a complete miscarriage of justice." *Bischel v. United States,* 32 F.3d 259, 263 (7th Cir.1994) (internal citations and quotations omitted). The record is reviewed and all reasonable inferences are drawn in favor of the government. *Id.; Messinger v. United States,* 872 F.2d 217, 219 (7th Cir.1989). Mohammad claims he was denied his sixth amendment right to effective assistance of counsel. Mohammad did not raise this issue on appeal. Ordinarily, the failure to raise an issue on direct appeal bars a defendant from raising it in a § 2255 proceeding. *Borre v. United States,* 940 F.2d 215, 217 (7th Cir. 1991). Nevertheless, because some of the grounds for Mohammad's ineffective assistance of counsel claim are based on evidence outside of the trial record, all of the grounds for his claim are properly asserted now. *Duarte v. United States,* 81 F.3d 75, 77–78 (7th Cir.1996); *Guinan v. United States,* 6 F.3d 468, 471–73 (7th Cir.1993).

To prevail on his claim of ineffective assistance of counsel, Mohammad must show that his counsel's conduct "fell below an objective standard of reasonableness" and "outside the wide range of professionally competent assistance." *Strickland v. Washington,* 466 U.S. 668, 690, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Counsel is "strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* Mo-

hammad must also show prejudice by demonstrating that it is reasonably likely that, but for his counsel's errors, the decision reached would have been different. *Id.* at 696. The counsel's errors must be so serious as to deprive the petitioner of a fair trial, that is, a trial whose result is reliable. *Lockhart v. Fretwell*, 506 U.S. 364, 369–70, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993). In other words, Mohammad "must establish that 'there is a reasonable probability that, but for counsel's unprofessional errors ... the factfinder would have had a reasonable doubt respecting guilt.'" *United States v. Adamo*, 882 F.2d 1218, 1226 (7th Cir.1989) (quoting *Strickland*, 466 U.S. at 695–96).

Attorney Julius Lucius Echeles ("Echeles") represented Mohammad at his preliminary hearing and at trial.[1] Mohammad argues that Echeles was ineffective in several ways. First, Mohammad argues that Echeles was ineffective because he failed to explore the possibility of a plea agreement, even though Mohammad asked about entering a plea on several occasions. Mohammad alleges that Echeles summarily dismissed his suggestions of a plea agreement and said that "the best he could do was ten to twelve years" either way. Mohammad asserts that Echeles failed to explain how the Federal Sentencing Guidelines worked or describe the advantages that might be available to him if he entered a plea.

■ In *Dillon v. Duckworth*, 751 F.2d 895, 901 (7th Cir.1984), the Seventh Circuit found that the "failure to initiate plea-bargaining negotiations is not always error, but in a case in which the State would prefer the defendant's testimony at an accomplice's trial, [a] defense counsel's failure to explore the possibility is inexplicable." In this case, there is no evidence that the government wanted to obtain Mohammad's cooperation against any other individuals. On the contrary, the government asserts that it was not interested in a guilty plea by Mohammad because he was the most culpable defendant and, hence, its primary target. Yet, the court in *Dillon* also found that whether the government would have encouraged or accepted a guilty plea, if

offered, was irrelevant. *Id.* What was considered relevant in *Dillon* was "the strong suggestion of unfamiliarity with the case and lack of preparation that the failure to try and plea bargain show[ed]." *Id.* Like the court in *Dillon*, this court finds that Echeles' alleged failure to even ask the government about the possibility of a plea agreement is inexplicable, especially if, as claimed, his client repeatedly inquired on the subject. Even more troubling is Echeles' alleged statement to Mohammad that the best he was going to do was "ten to twelve years" either way; this is simply not a fair or accurate description of Mohammad's situation. Pleading guilty typically results in at least a two-level adjustment, in the defendant's favor, for acceptance of responsibility. *See* U.S.S.G. § 3E1.1. The reduction in the defendant's offense level translates into less jail time. Adjustments relating to a defendant's role in the offense—such as the four-level increase that Mohammad received under U.S.S.G. § 3B1.1(a) for being an organizer or leader of extensive criminal activity—are also often the subject of negotiation.

■ The Seventh Circuit has found that "in the ordinary case criminal defense attorneys have a duty to inform their clients of plea agreements proffered by the prosecution, and that [the] failure to do so constitutes ineffective assistance of counsel under the sixth and fourteenth amendments." *Johnson v. Duckworth*, 793 F.2d 898, 902 (7th Cir.1986). The court also found that defendants "must be involved in the decision-making process regarding [an] agreement's ultimate acceptance or rejection." *Id.* It follows from this rationale that a defendant who expresses an interest in pleading guilty has a similar right to be adequately informed of the risks and advantages of doing so, including an explanation of how the Sentencing Guidelines affect his case. Therefore, the court will appoint Mohammad an attorney to further investigate this claim of ineffective assistance of counsel. The court will determine whether an evidentiary hearing is necessary after it receives additional submissions from Mohammad's appointed attorney and the government.

---

1. Attorney David C. Thomas represented Mohammad on appeal. Mohammad does not challenge his effectiveness.

Second, Mohammad argues that Echeles was ineffective because he failed to introduce certain documents and testimony into evidence. According to Mohammad, Rose McGee ("McGee") testified at trial that she leased the warehouse, in which defendants stored the goods, to Mohammad and that she received lease payments from him. Mohammad claims that he was not a party to the lease and did not pay the rent. Mohammad asserts that Echeles should have obtained lease and bank records to discredit McGee's testimony and demonstrate that he was not a party to the lease. Mohammad asserts that Echeles failed to obtain these documents, even though he promised to acquire them. Mohammad also argues that Echeles should have called McGee's father to testify. Mohammad argues that it was McGee's father, not McGee, who leased the warehouse to Discount, and that McGee's father dealt, not with him, but with his brother, Anwar Saleh ("Saleh"), the president of Discount.

Mohammad also argues that Echeles should have called an FBI agent, who he does not identify, as a witness and asked him about the Discount rent checks bearing Mohammad's signature. In addition, Mohammad argues that Echeles should have retained a handwriting expert to challenge the authenticity of his signatures on those checks. Mohammad claims that the testimony of these witnesses would have shown that he never signed any checks on behalf of Discount.

Mohammad also argues that Echeles should have offered photographs and blueprints into evidence to discredit testimony that the warehouse was "as big as a football field." Finally, Mohammad argues that Echeles should have presented the testimony of certain grocery store owners to rebut evidence that Mohammad sold goods to them and collected money from them.

Mohammad's second argument is without merit. Contrary to Mohammad's assertion, the lease itself was admitted into evidence. McGee did not testify that Mohammad's name was on the lease. Rather, McGee testified that although Mohammad made the decision to rent the property, Saleh was named as the lessor on the lease. The lease indicates that Discount was the tenant and appears to bear Saleh's signature. On cross-examination, Echeles challenged McGee's testimony that Mohammad was present when the lease was first negotiated. McGee also testified that her mother and father helped her manage the warehouse, dealt with the lessees, and often collected the rent for her. The testimony of McGee's father would not, therefore, have impeached McGee's testimony, as Mohammad claims. Mohammad has thus failed to demonstrate incompetence or prejudice with respect to the issue of who leased the warehouse.

Mohammad argues that Echeles should have obtained "bank records" to prove he did not pay the rent for the warehouse, but he does not specifically describe the records to which he refers. Nor does he claim that these records were available. These allegations are insufficient. *See Barkauskas v. Lane*, 946 F.2d 1292, 1295 (7th Cir.1991) (petitioner establishing prejudice must present actual evidence of exculpatory testimony that counsel allegedly overlooked). Nor do they justify an evidentiary hearing on the matter. *See Prewitt v. United States*, 83 F.3d 812, 819 (7th Cir.1996) (unsupported or conclusory allegations do not entitle a petitioner to an evidentiary hearing on a § 2255 motion); *Daniels v. United States*, 54 F.3d 290, 293 (7th Cir.1995) (an evidentiary hearing is not necessary if the petitioner makes conclusory or speculative allegations, rather than specific factual allegations).

In any event, McGee's testimony was sufficiently challenged without bank records. McGee testified that she that she personally collected the rent from Mohammad approximately ten times and witnessed Mohammad sign the checks. She also testified that the FBI agent assigned to the case, John Diwik ("Diwik"), and the Assistant United States Attorney showed her a copy of at least one check made payable to McGee and signed by Mohammad, and that she recognized his signature on that check.[2] Echeles showed her a

---

2. The existence of this check suggests that any bank records available would not have been favorable to Mohammad.

copy of the check and attempted to call her identification of Mohammad's signature into doubt. Echeles also presented Mohammad's testimony that he did not lease the warehouse from McGee or pay the rent.

As stated above, Mohammad does not identify the FBI agent he claims should have been questioned about the rent checks. Although the court may reasonably assume that Mohammad is referring to Diwik, Mohammad fails to explain how any testimony by Diwik would have helped his cause. Mohammad also argues that Echeles should have hired a handwriting expert, but fails to claim that such an expert was available and willing to testify on his behalf or describe what the testimony of that expert would have been. These allegations are insufficient. *See Patel v. United States*, 19 F.3d 1231, 1237 (7th Cir.1994) ("Where a petitioner claims his trial counsel failed to call a witness, he must make a specific, affirmative showing as to what the missing evidence would have been, and prove that this witness's testimony would have produced a different result") (citations omitted). Thus, Mohammad has failed to demonstrate incompetence or prejudice with respect to the issue of who paid the rent for the warehouse as well.

The failure to produce evidence about the size of the warehouse cannot be considered prejudicial since the issue of its size was collateral to the issue of Mohammad's guilt. The failure to present the testimony of certain grocery store owners cannot sustain Mohammad's claim either. Without attaching any supporting affidavits, Mohammad asserts that these individuals would have testified that they did business with Discount, but did not know him. Mohammad may not speculate as to what the store owners testimony would have been in this manner. *Daniels*, 54 F.3d at 293. Moreover, even if this court were to assume that the store owners would have testified as Mohammad claims, he fails to demonstrate that their testimony would have

made a difference. The fact that certain store owners did not know Mohammad or deal with him directly is not inconsistent with his guilt, especially in light of the testimony of government witness Suliman Abu Awwad ("Awwad") that Mohammad pretended to be his brother Saleh on the phone with Discount customers. Accordingly, the court rejects Mohammad's second argument.

■ Third, Mohammad argues that Echeles was ineffective because he engaged in hostile confrontations with the district court judge, often in front of the jury. This allegation alone cannot support a claim for ineffective assistance of counsel because Mohammad does not describe any of these incidents in any detail. Mohammad does, however, describe one confrontation between Echeles and the judge in his reply. There, Mohammad asserts that Echeles failed to adequately cross-examine Awwad. Awwad testified that Mohammad was the "boss" and actually ran Discount, even though Saleh was the president. Mohammad claims that Echeles' performance was so inadequate that the judge admonished him severely in front of the jury and instructed the jury to disregard his entire line of questioning, striking it from the record. Mohammad asserts that Echeles continued to argue and caused the judge to admonish him in front of the jury again. Mohammad claims that Echeles did not attempt to properly cross-examine Awwad thereafter.[3]

Mohammad does not describe how he was allegedly prejudiced by the events surrounding Awwad's testimony—whether he was damaged by the allegedly inadequate cross-examination, the effect of the judge's reprimands on the jury, or the alleged bias of the judge as evidenced by the reprimands. The court will therefore address each theory. With respect to the cross-examination of Awwad itself, the court finds that Echeles' technique may have been flawed at times. The

---

**3.** Mohammad also claims that the government paid Awwad $4500 "to assure his testimony." Although Mohammad does not elaborate on this statement, he is apparently claiming that Awwad was bribed. The court does not consider this separate allegation of misconduct because it appears for the first time in Mohammad's reply brief. Even if it were considered, the court would reject this claim. Awwad admitted on cross-examination that the FBI paid him $4500 for his assistance. He testified that the FBI paid him because he took many days off of work to assist them in their investigation. Mohammad does not present, or even describe, any evidence that would support his implied allegation of impropriety.

court cannot conclude, however, that the cross-examination was, on the whole, incompetent. Even if the court were to assume that it was, it cannot find that Echeles' failure to cross-examine Awwad more effectively resulted in any prejudice. Awwad's testimony did not go unchallenged. For example, Mohammad testified, in contradiction to Awwad's testimony, that he was only a salesman and did not own or operate Discount. In addition, although Awwad's testimony was significant, there was other evidence of Mohammad's controlling role in the bust-out scheme. Accordingly, the court rejects the theory that Mohammad was prejudiced by the alleged inadequacy of Echeles' cross-examination of Awwad.

▆ The court also rejects the other two theories of prejudice. The exchange Mohammad describes took place in the middle of Echeles' cross-examination of Awwad. Echeles was attempting to impeach Awwad with portions of his grand jury testimony. At sidebar, the judge expressed his concern that Echeles' questions were ambiguous. When Echeles responded that his questions were proper, the judge told him to stop talking loud enough for the jury to hear. After further discussion at sidebar, the judge reminded the jury that the arguments of counsel are not evidence, and cross-examination continued.

After several questions, the government again objected. The objection was sustained. After several more questions and objections, the judge again expressed his concern that Echeles was confusing the witness and the jury, and then attempted to explain the ambiguity of Echeles' questions to the jury. After several more questions, the government objected again, asserting that Echeles' questions constituted improper impeachment. The court sustained the objection. When Echeles asked what objection was being sustained, the judge stated that Echeles was using improper technique for either impeachment or refreshed recollection, that the objection was to the form of his questions, and

that it was the same objection that had been made and sustained approximately three times in ten or fifteen minutes. The judge then stated that "the only thing I can do at this moment in time because you have continued to persist in that technique is to instruct the jury to ignore this entire line of questioning. It's all stricken from the record." When Echeles protested, the judge instructed him to refrain from arguing points of law in front of the jury. Echeles, however, continued to protest. The judge again stated that Echeles would not be permitted to argue about issues of law in front of the jury. When Echeles persisted, the court warned him that he would be held in contempt of court if he continued.

The court then excused the jury and discussed the matter at length with the lawyers. The judge indicated his displeasure, but did not attack Echeles personally or exhibit any hostility. On the contrary, the judge began by stating that he enjoyed Echeles' presence in the courtroom. Echeles moved for a mistrial, but his request was denied. Before resuming, the judge addressed the jury, stating:

> Sometimes lawyers have a position on the law that they want to maintain and they have a right to, so if you see a difference of opinion between the lawyers and each other or the lawyers and the Court, that's not for you to decide. Just leave that to me. You're listening to the evidence and the facts and that's your job. Mine is the law.

> The lawyers are zealous. They're all very experienced professionals, and they need to sometimes make their point strongly. So don't let that interfere with anything that you're trying to do, all right?

Echeles then continued and concluded his cross-examination of Awwad without incident.

Like the Seventh Circuit,[4] this court concludes that interaction between Echeles and

---

**4.** On appeal, Mohammad argued that the district court's remarks during Awwad's cross-examination prejudiced the jury against him and demonstrated bias by the district court judge. *United States v. Mohammad*, 53 F.3d 1426, 1433–34 (7th Cir.1995). Although the Seventh Circuit found

that the district court's reaction to Echeles could have been "a bit more measured," it found that the exchange did not prejudice Mohammad in the eyes of the jury or demonstrate any bias. *Id.* at 1434.

the district court described above did not prejudice the jury or demonstrate any bias on the part of the district court judge. Echeles persisted in arguing a point of law in the jury's presence, and the court reacted in a manner consistent with its obligation to ensure the orderly presentation of evidence. The judge's comments to the lawyers during sidebar exhibited a lack of bias. His comments to the jury were meant to alleviate any appearance of bias. In short, the judge did not engage in behavior even remotely like that denounced in the well-known case on this subject, *United States v. Dellinger*, 472 F.2d 340, 385–91 (7th Cir.1972). Accordingly, the events surrounding Awwad's cross-examination cannot support a claim for ineffective assistance of counsel.

 Finally, Mohammad argues that Echeles was ineffective because he was inattentive. He asserts that Echeles was elderly, in poor health, and on daily medication throughout his trial. Mohammad argues that, as a result, Echeles often fell asleep in court and had to be awakened several times a day. Although inattentiveness could affect the outcome of a defendant's trial, Mohammad fails to describe specifically how Echeles' alleged inattentiveness prejudiced his defense. Conclusory allegations of prejudice are insufficient. *Prewitt v. United States*, 83 F.3d 812, 819 (7th Cir.1996). Accordingly, the court rejects this argument as well.

Ultimately, Mohammad summarizes Echeles' alleged ineffectiveness by stating that he "fail[ed] to formulate and carry out any defense strategy." Echeles did, however, present a twofold defense. First, Echeles presented Mohammad's testimony that he did not own or control Discount, but was merely a commissioned salesman. Second,

Echeles presented Mohammad's testimony that the huge sums of cash deposited into his bank accounts were the proceeds of his second occupation as a gold salesman. The court, therefore, rejects this allegation as a basis for relief.

### CONCLUSION

Mohammad's petition for relief pursuant to 28 U.S.C. § 2255 is denied in part.[5]

---

5. Another unrelated matter concerning Mohammad must also be resolved. On September 22, 1997, the Probation Department asked this court to modify the conditions of Mohammad's sentence to provide for his participation in a drug treatment program. The government objected to any modification of Mohammad's sentence or approval of his participation in such a program. In response, Mohammad argued that this court's approval was unnecessary because the decision to allow him to participate in a drug treatment program or to reduce his sentence due to the successful completion of such a program was

within the sole discretion of the Bureau of Prisons. On February 17, 1998, Mohammad filed a motion "to dismiss [the] proceeding relating to [the] previous motion for [the] modification of [his] sentence to provide for drug treatment." Mohammad argues that the request for sentence modification should be dismissed because the Bureau of Prisons has already made a determination with respect to his participation in a drug treatment program without court approval. The government does not object to Mohammad's motion to dismiss. Accordingly, that motion is granted.